UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CASE NO. 1:09-cv-00006

DENISE WALKER, as Administratrix of the                                   PLAINTIFFS
Estate of THOMAS BRIAN GERMANY,
Deceased, and as Next Friend of
T.A.G., a Minor

vs.                                    **COMPLAINT**

DANNY DAVIS, Allen County Deputy
Sheriff, in his Individual Capacity

       Serve:  Danny Davis
             605 E. Elm Street
             Scottsville, Kentucky 42164

- and -

SAM CARTER, Allen County Sheriff,
in his Individual and Official Capacities

       Serve:  Sam Carter
             194 Wood Street
             Scottsville, Kentucky 42164                        DEFENDANTS

* * * * * * * * * * * *

Come the Plaintiffs, Denise Walker, as Administratrix of the Estate of Thomas Brian

Germany ("Brian Germany"), Deceased, and as Next Friend of T.A.G., a Minor, by counsel, and

for their Complaint against the Defendants, Danny Davis, Allen County Deputy Sheriff, in his

Individual Capacity, and Sam Carter, Allen County Sheriff, in his Individual and Official

Capacities, state and allege as follows:

## INTRODUCTION

The dangers of police pursuits have been known by the law enforcement community for many years.  One out of every 100 police pursuits ends in death.  The majority of pursuits are of traffic violators, not dangerous criminals.  The National Highway Traffic Safety Administration reported that 314 people were killed during pursuits in 1998. Of those 314 deaths, only 2 were police officers (00.63%), while 198 were the individuals being pursued (63.06%) and, perhaps most tragically, 114 of those killed were innocent bystanders (36.31%).  It is widely believed that due to deficiencies in the NHTSA reporting system the actual number of pursuit deaths every year is even higher.

The law enforcement community also knows that pursuing officers are commonly overcome by a condition known as "pursuit-induced adrenaline overload."  The speed, the blaring siren and the overwhelming desire to apprehend the suspect cause the officer's adrenaline level to soar, resulting in tunnel vision, target fixation, diminished motor skills, and severe limitations on short-term memory and the reasoning portions of the brain.  The officer is left with nothing more than long-term memory and primal, emotional instincts.  While law enforcement is well aware of this phenomenon, fleeing suspects are not.

A typical patrolling officer is far more likely to be confronted with a pursuit situation than a gunfight.  For that reason training about pursuits is a critical concern for every conscientious law enforcement agency.  The vast majority of the workday of a street officer is spent behind the wheel of an automobile—the single most dangerous weapon ever placed in human hands.  A 4,000 pound police cruiser can cause more destruction in a split second than any firearm, especially under the extreme conditions and rapidly changing environments encountered during a pursuit.

Just as no reasonable law enforcement agency would allow its officers to fire a gun without strenuous and ongoing training and a full appreciation for the consequences of that decision, no reasonable law enforcement agency would allow an officer to fire his car at a fleeing suspect without the same or greater training and appreciation for the consequences.  Pursuing officers must possess suitable decision-making skills for the choices that must be made during a pursuit.  Pre-pursuit training, just like firearms training, prepares officers for those decisions.

In an effort to curb the known dangers of pursuits and to ensure that pursuits are done safely, many law enforcement agencies have adopted policies that govern whether, when and how their officers engage in pursuits.  Sam Carter, the Allen County Sheriff, enacted such a policy in May, 2007.  That written pursuit policy, however, was purely for show.  It has never been taught, it has never been followed and it has never been enforced.  The actual policy of the Allen County Sheriff's Office is that the apprehension of traffic violators is more important than anything, including the lives and safety of the people in the community.

As a result of Sam Carter's "anything goes" policy, Danny Davis, acting as judge, jury and executioner, gave Brian Germany the death penalty for speeding.

## JURISDICTION AND VENUE

1.      This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over the § 1983 claims pursued herein.

2.      This Court has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims herein that that are so related to the claim or claims that form the basis of the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## THE PARTIES

4.     Plaintiff Denise Walker, as Administratrix, is the duly appointed, qualified and acting Administratrix of the Estate of Thomas Brian Germany ("Brian"), Deceased, pursuant to an Order entered on April 30, 2008 by the Allen County, Kentucky District Court in Case No. 08-P-00061.

5.     Plaintiff Denise Walker, as Next Friend, is the legal custodian of and brings claims herein on behalf of T.A.G., Brian Germany's minor son.

6.     At all times material hereto, Brian Germany, Deceased, T.A.G., a Minor, and Denise Walker, Administratrix and Next Friend, were or are residents of Allen County, Kentucky.

7.     At all times material hereto, Defendant Danny Davis was employed as a Deputy Sheriff in the Allen County, Kentucky, Sheriff's Office, whose office and principal place of business is 194 Wood Street, Scottsville, Kentucky 42164.  Danny Davis is sued in his individual capacity only.

8.     At all times material hereto, Defendant Sam Carter was employed as the Sheriff of Allen County, Kentucky, whose office and principal place of business is 194 Wood Street, Scottsville, Kentucky 42164.  Sam Carter is sued in his individual capacity and in his official capacity as the Allen County Sheriff.

9.     At all times material hereto, Danny Davis was acting within the course and scope of his employment as an Allen County Deputy Sheriff.

10.     At all times material hereto, Sam Carter was acting within the course and scope of his employment as the Allen County Sheriff.

11.    The act of driving a police cruiser, even during a pursuit, is a ministerial act for which Danny Davis, in his individual capacity, is not entitled to qualified immunity.  *Jones v. Lathram*, 150 S.W.3d 50 (Ky. 2004).

12.    The training, supervision and monitoring of Danny Davis, the enforcement the Allen County Sheriff's Office's written pursuit policy and Kentucky laws relating to police pursuits and the safe operation of police vehicles, and the retention of Danny Davis as a deputy sheriff when he did not have suitable skills are ministerial acts for which Sam Carter, in his individual capacity, is not entitled to qualified immunity.  *See, e.g.*, *Yanero v. Davis*, 65 S.W.3d 510 (Ky. 2001); *Franklin County v. Malone*, 957 S.W.2d 195 (Ky. 1997); *Whitt v. Reed*, 239 S.W.2d 489 (Ky. 1951).

13.    To the extent that any conduct alleged herein by Danny Davis or Sam Carter, in their individual capacities, is deemed to be a discretionary act, they are not entitled to qualified immunity given that their conduct violated clearly established constitutional rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

14.    Sam Carter, in his official capacity as the Allen County Sheriff, is vicariously liable for the tortious acts and omissions of Danny Davis.  *Jones v. Cross*, 260 S.W.3d 343 (Ky. 2008).

## FACTUAL ALLEGATIONS

15.    On May 24, 2007, the Allen County Sheriff's Office ("ACSO"), by and through Sam Carter, enacted a written pursuit policy governing the conduct of its employees, including Danny Davis, in pursuing fleeing suspects ("written pursuit policy").  A copy of the written pursuit policy is attached hereto as EXHIBIT 1.

16.     At approximately midnight on March 22, 2008, Darren Tabor, an officer with the Scottsville Police Department, attempted to make a traffic stop of a motorcycle driven by Brian Germany on Highway 31E.

17.     The alleged violation of law for the attempted stop was speeding approximately 70 mph in a 55 mph zone.

18.     Allen County Deputy Danny Davis heard the pursuit on his police radio and headed off to join the pursuit.

19.     Danny Davis joined the pursuit and soon took over as the lead pursuit vehicle, passing Darren Tabor when Tabor appropriately slowed at a red light, without being requested to do so by Officer Tabor or anyone at the Scottsville Police Department and without seeking or receiving authorization from his supervisor or anyone at the Allen County Sheriff's Office.

20.     The entire pursuit lasted approximately five minutes.

21.     Danny Davis knew the suspect he was pursuing was riding a black Harley-Davidson motorcycle, knew the suspect was wearing a black leather jacket, knew the suspect was not wearing a helmet, and knew the temporary tag license number on the motorcycle.

22.     Danny Davis knew the suspect he was pursuing was Brian Germany.

23.     SPD Officer Tabor, who continued to follow the pursuit, has testified that there were no other persons present at any time during the pursuit.

24.     The pursuit began on Highway 31E at Cartertown Road, to Old Gallatin Road, to Sunset Hill Road, back to Highway 31E (where Danny Davis chose to take over), to Oliver Street, to Old Franklin Road/Highway 100, to Highway 585, and finally into a field.  A diagram of the pursuit route is attached hereto as EXHIBIT 2.

25.     During the pursuit Danny Davis followed very close behind Brian's motorcycle.

26.    On at least one occasion, Danny Davis was following Brian's motorcycle so closely on Highway 100 that he almost struck Brian's motorcycle.

27.    As the pursuit traveled along Highway 585 in rural Allen County, Brian's motorcycle left the roadway and entered a field.  The field, just west of the house at 575 Old Franklin Road, is a steep downhill grade to the left.

28.    Danny Davis was familiar with the field and "knew the property well" because his former father-in-law tended it and his former father-in-law's brother owned it.  Danny Davis knew there was a ravine at the end of the field, and knew there was nowhere for Brian to go once he reached the end of the field, which was only a few hundred yard away.

29.    Danny Davis knew or should have known that the grass in the field was wet and the ground was soft.

30.    Danny Davis owns and rides a street motorcycle, knew that Brian's Harley-Davidson street bike was not designed for off-road use, and knew that Brian's street bike would not handle or respond as designed in the field.

31.    Danny Davis knew that his police cruiser was not designed for off-road use, knew that his police cruiser would not handle or respond as designed in the field, and knew that his stopping distance would be dramatically increased by the conditions in the field.

32.    After entering the field, Danny Davis intentionally rammed the rear of Brian Germany's motorcycle.

33.    Brian Germany was thrown from his motorcycle by the impact.

34.    Danny Davis was travelling so fast and following Brian's motorcycle so closely that he could not stop and ran over Brian.

35.     Danny Davis was travelling so fast and following Brian's motorcycle so closely that he did not even know that Brian was pinned underneath the front axle of his cruiser.

36.     Brian was unable to breathe with the weight of Danny Davis's vehicle on top of him.

37.     After several minutes, unable to draw a breath, Brian died.

38.     Brian died of "compression asphyxia"—in other words, he was suffocated to death by the weight of Danny Davis's vehicle on his chest.

39.     Brian was conscious before succumbing to the compression asphyxia.

40.     During the last minutes of his life, Brian's body was scalded by the intense heat of the police car's engine, which Danny Davis had left running.

41.     During the last minutes of his life, Brian also endured other significant injuries to his head, face, neck, chest, buttocks, left flank, right thigh, right leg and right foot.

42.     Danny Davis admitted to a Kentucky State Police investigating officer that he had illegal drugs in his system at the time of Brian's death.  Sam Carter was present when that admission was made.

43.     Danny Davis later told Sam Carter that he smoked marijuana at some point within 18 hours of the pursuit.

44.     Sam Carter knew that Danny Davis was "going through a hard time" and suffering from emotional problems at the time of the pursuit.

45.     Sam Carter knew that Danny Davis tested positive for opiates in a drug test on January 2, 2007, but Sam Carter and the Allen County Sheriff's Office have no record that Danny Davis had a valid prescription for any opiate.

46.     Sam Carter knew or should have known that Danny Davis failed a drug test when applying for employment as a school bus driver with the Allen County Board of Education.

47.     Sam Carter took no steps to ensure that Danny Davis did not perform his duties as a deputy while under the influence of marijuana, opiates or other drugs, and Sam Carter took no steps to ensure that Danny Davis did not operate his police vehicle while under the influence of marijuana, opiates or other drugs.

48.     Marijuana, opiates and other drugs diminish decision-making skills, impair judgment, reduce motor skills and slow reaction times, all of which are necessary to safely operate a motor vehicle under any circumstances and are vital during a pursuit.

49.     Blood was drawn from Danny Davis for toxicology testing approximately three hours after the pursuit. The associated paperwork was completed by Cory Buckner, who at the time was a sergeant with the Kentucky State Police ("KSP").  He has since been fired.  On December 2, 2008, the Kentucky State Police Trial Board found Cory Buckner guilty of four violations of the Kentucky State Police Standards of Conduct: Honesty (a Class A violation), Conformance to Law (one Class A violation and one Class B violation) and Responsibility of Ranking Officers (a Class B violation).  Those charges concerned misconduct involving KSP records.

50.     In spite of the knowledge that Danny Davis told investigating KSP officers that "I am not going to pass that" blood test because he had "done some things he shouldn't have," *see* EXHIBIT 3, Cory Buckner filled out the toxicology paperwork so the blood would be tested only for alcohol.  Cory Bucker's deception was later discovered by the Kentucky State Police, and the blood sample was tested for some drugs.  Those tests came back negative.  However, Cory Buckner knew that the standard KSP blood toxicology does not test for marijuana/cannabis, and

that to test for marijuana/cannabis he would need to obtain a urine sample from Danny Davis. No urine sample was obtained.    A copy of the Kentucky State Police toxicology file in KSP Case No. 03-08-0215 is attached hereto as EXHIBIT 3.

51.    Sam Carter and Danny Davis knew or should have known about, or were complicit in, Cory Bucker's attempts to influence the results of Danny Davis's toxicology testing and to otherwise render the toxicology results inaccurate.

52.    The Plaintiffs are currently in the process of having Danny Davis's blood sample re-tested for, among other things, marijuana, pursuant to orders entered by the Allen Circuit Court on December 11, 2008 and January 5, 2009 in Case No. 08-CI-00224.

53.    Danny Davis attempted to deceive Kentucky State Police investigating officers by claiming that Brian's motorcycle went down before it was struck by Danny Davis's vehicle.

54.    This fabrication is exposed by the Kentucky State Police investigation and the physical evidence at the scene.  A Kentucky State Police reconstructionist, the lead investigator, found that it was "**evident** from the marks on the motorcycle that the Sheriffs Department vehicle had struck the motorcycle in the rear" and "**clearly show[s]** that the motorcycle was upright when it was hit," and again that it is "**obvious** that the vehicle struck the motorcycle from the rear while the motorcycle was upright" (emphasis added). A copy of the written portions of the Kentucky State Police investigative file in KSP Case No. 03-08-0215 are attached hereto as EXHIBIT 4.  The investigative file also contains 147 photographs and the audiotaped statements of Danny Davis and Darren Tabor.

55.    Danny Davis attempted to deceive Kentucky State Police investigating officers by claiming that Brian abruptly made a sharp left turn into the path of his vehicle in the field.

56.     This fabrication is exposed by the physical evidence at the scene, including the tire tracks left in the field by Danny Davis's cruiser and Brian's motorcycle, the damage to Danny Davis's front bumper caused by its direct impact with the rear of the tailpipe on the right side of Brian's motorcycle, and other damage to the rear of Brian's motorcycle caused by its direct impact with Danny Davis's vehicle.

57.     Danny Davis violated the Allen County Sheriff's Office's written pursuit policy and Kentucky law regarding the safe operation of emergency vehicles.

58.     Danny Davis violated at least eight (8) provisions of the ACSO pursuit policy, Exhibit 1, by joining and engaging in the pursuit in the first place:

(a)     Pursuits for misdemeanor and traffic violations are prohibited. § Definitions.

(b)     The deputy must have reasonable suspicion to believe that the violator being pursued is a felon or suspected felon. § Definitions.

(c)     Deputies in the vicinity of the pursuit will remain on their assigned beats unless requested to participate in the pursuit by a supervisor. § B.3.

(d)     Deputies shall not parallel the pursuit without supervisory approval. § B.3.

(e)     ACSO's participation in an allied agency's pursuit is appropriate only in response to a specific request for participation. § E.2.

(f)     Mere notification of the existence of a pursuit shall not be construed as a request for participation. § E.2.

(g)     Prior to acceptance of the pursuit from an allied agency, the ACSO field supervisor shall determine the ACSO involvement, if any, and provide the appropriate direction. § E.2.

59.     Danny Davis violated at least three (3) provisions of the ACSO written pursuit policy by continuing the pursuit:

(a)     Deputies will terminate a pursuit when no ACSO field supervisor or higher authority can be contacted to approve the continuation of the pursuit. § B.4.c.2.

(b)    After the deputy makes the decision to engage in the pursuit, it is his responsibility to immediately notify the communications center of the location, direction of travel and approximate speed of the pursuit; vehicle description; the age and a description of the person being pursued; and the reason for the pursuit and specific law violations. § B.1.b.2.

(c)    Deputies must update the information described above throughout the pursuit. § B.1.b.2.

60.    Danny Davis violated at least twenty-six (26) provisions of the ACSO written pursuit policy by pursuing Brian's motorcycle into the field and intentionally ramming the motorcycle:

(a)    Ramming is prohibited. § D.3.a.

(b)    The decision to attempt to forcible stop a fleeing vehicle shall be based on careful consideration of all facts apparent to the pursuing deputy. § D.1.

(c)    A supervisor's permission should be obtained prior to initiating a forcible stop. § D.1.

(d)    A forcible stop of a pursued vehicle may be undertaken ONLY when the deputy has reason to believe that the continued movement of the pursued vehicle  would place others in imminent danger of great bodily harm or death. § D.2.a. (emphasis in original).

(e)    A forcible stop of a pursued vehicle may be undertaken ONLY when the apparent risk of harm to other than the occupant of the pursued vehicle is so great as to outweigh the apparent risk of harm involved in making the forcible stop. § D.2.b. (emphasis in original).

(f)    A forcible stop of a pursued vehicle may be undertaken ONLY after all other reasonable means of apprehension have been exhausted and/or considered and rejected as impractical, such as continuing to follow, calling for assistance from the ACSO, or calling for assistance from other law enforcement agencies. § D.2.c. (emphasis in original).

(g)    Under KRS 503.090(1), the use of physical force in making an arrest is justifiable only when the officer believes physical force is necessary to make the arrest. § D.2 Note 1.

(h)    Under KRS 503.090(2), the use of deadly force in making an arrest is justifiable only when the officer believes deadly force is necessary to make the arrest. § D.2 Note 2.

(i)     Under KRS 503.090(2), the use of deadly force in making an arrest is justifiable only when the arrest is for a felony involving the use or threatened use of physical force which is likely to cause death or seriously physical injury. § D.2 Note 2.

(j)     Under KRS 503.090(2), the use of deadly force in making an arrest is justifiable only when the person making the arrest believes the person to be arrested is likely to endanger human life unless apprehended without delay. § D.2 Note 2.

(k)     Deputies will terminate a pursuit when the circumstances of the pursuit present an extreme safety hazard to the suspect. § B.4.c.1.

(l)     Apprehension of occupants of a motor vehicle is secondary to importance of public safety. § Intro.

(m)    It is the responsibility of the primary pursuit unit to conduct the pursuit with due regard for the safety of others. § B.1.a.2.

(n)     Although misdemeanor and traffic violation pursuits are never permitted, § Definitions, because of the hazards to both the public and deputies it may be necessary to abandon the pursuit of some *felony* offenders rather than continue, § B.4.a.

(o)     In assessing danger to life and property during a pursuit, deputies should take into account the area or location of the pursuit. § A.5.

(p)     In assessing danger to life and property during a pursuit, deputies should take into account the roadway/surface conditions. § A.3.

(q)     In assessing danger to life and property during a pursuit, deputies should take into account their vehicle type. § A.7.

(r)     In assessing danger to life and property during a pursuit, deputies should take into account the lighting conditions. § A.4.

(s)     In assessing danger to life and property during a pursuit, deputies should take into account the nature and seriousness of the offense. § A.8.

(t)     In assessing danger to life and property during a pursuit, deputies should take into account the availability of assistance. § A.9.

(u)     In assessing danger to life and property during a pursuit, deputies should take into account the likelihood of a successful apprehension. § A.10.

(v)     Although pursuits for misdemeanor and traffic violations are never permitted, § Definitions, strong consideration should be given to

terminating a *felony* pursuit when the conditions limit the probability of a safe and successful end to the pursuit, § B.4.b.1.

(w)    Although pursuits for misdemeanor and traffic violations are never permitted, § Definitions, strong consideration should be given to terminating a *felony* pursuit when the violator can be identified to the point where later apprehension can be accomplished and the violator is not a threat to the public, § B.4.b.2.

(x)    Although pursuits for misdemeanor and traffic violations are never permitted, § Definitions, strong consideration should be given to terminating a *felony* pursuit when the deputy knows or has reason to believe the fleeing vehicle is being operated by a driver who is intoxicated or otherwise impaired and poses an extreme safety hazard, § B.4.b.4.

(y)    Deputies must use good judgment during pursuits. § Intro.

(z)    The safety of the community must come first. § Intro.

61.    Sam Carter and the Allen County Sheriff's Office violated at least seven (7) provisions of their own written pursuit policy during and after the pursuit:

(a)    The Immediate Supervisor of the primary pursuit vehicle must acknowledge the communications when advised of the pursuit in progress. § C.1.a.

(b)    The Immediate Supervisor of the primary pursuit vehicle must monitor the pursuit. § C.1.b.

(c)    The Immediate Supervisor of the primary pursuit vehicle must take necessary action to assure compliance with this policy. § C.1.b.

(d)    The Immediate Supervisor of the primary pursuit vehicle must assume functional responsibility for all involved units. § C.1.c.

(e)    The Immediate Supervisor of the primary pursuit vehicle must terminate the pursuit if, in his or her judgment, the necessity of apprehension is outweighed by the apparent danger involved. § C.1.d.

(f)    The Immediate Supervisor of the primary pursuit vehicle must go to the location of the pursuit termination and supervise the scene. § C.1.e.

(g)    The Immediate Supervisor of the primary pursuit vehicle must investigate the incident and complete a Pursuit Report Form. § C.1.f.

62.     In spite of the forty-four (44) violations of the written pursuit policy by Danny Davis and Sam Carter during the pursuit of Brian Germany, Sam Carter determined that there were no violations during the pursuit, and neither Danny Davis nor any other ACSO employee was disciplined, reprimanded or otherwise counseled for any possible violation of the written pursuit policy during the pursuit.

63.     In the 24 months since Sam Carter took office on January 1, 2007 as the Sheriff of Allen County, population 17,800, there have been seven known pursuits by employees of the Allen County Sheriff's Office. A compilation of summaries and statistics for the seven known pursuits by employees of the Allen County Sheriff's Office since Sam Carter took office is attached as EXHIBIT 5.

64.     In spite of the written pursuit policy requirements, the Allen County Sheriff's Office claims to have no records relating to two of these pursuits, even though one involved a deputy who had been on the force for only two months who lost control of his vehicle during the pursuit and flipped his cruiser.  *See* EXHIBIT 5 at p. 2.

65.     Although the national statistics for pursuits are staggering, *see supra* p. 2, pursuits by the Allen County Sheriff's Department under Sam Carter are far more dangerous.   For example, an ACSO deputy involved in a pursuit has a 43% chance that his vehicle will be damaged.  But the risk of vehicle damage to innocent third parties is even greater (50%), and the risk of vehicle damage to suspects greater still (57%).  More disturbingly, an ACSO officer has only a 5% chance of being injured in a pursuit, but the risk of injury to third parties is more than four times greater than the risk to deputies (22%), and the risk of injury to suspects is more than eight times greater (43%).

- 15 -

66.     There have been two pursuits involving ACSO deputies since Sam Carter took office where the suspect was not immediately apprehended.  In one the pursuit was voluntarily discontinued, and in the other a deputy wrecked and another was outrun.  In at least one of those pursuits, and probably both, the suspect was apprehended soon thereafter.  *See* EXHIBIT 5 at pp. 2, 7.  Notably, in the only other pursuit involving a fleeing motorcycle, the suspect was apprehended the following day.  *See* EXHIBIT 5 at p. 2.

67.     Sam Carter did not provide any training or guidance to deputies about the written pursuit policy, did not discuss the written pursuit policy with deputies, and otherwise took absolutely no steps to ensure that deputies understood the written pursuit policy and followed the written pursuit policy.

68.     In the 19 months since Allen County Sheriff's Office written pursuit policy went into effect, there have been multiple and repeated violations of the written policy by ACSO employees, including multiple and repeated violations by Sam Carter, but no ACSO employee has ever been disciplined, reprimanded or otherwise counseled for any possible violation of the written policy.

69.     For example, not a single one of the seven pursuits since Sam Carter took office began for a felony or suspected felony. To the contrary, almost all of them were traffic violations.  Further, deputies routinely join pursuits without being requested to do so and without obtaining permission from their supervisor.  On at least one occasion several off-duty deputies heard about a pursuit over their police radios at home and rushed out to join the pursuit.  *See* EXHIBIT 5 at p. 5.  These are clear and undisputable violations of the written pursuit policy.

70.     Under the written pursuit policy, an ACSO "deputy must have reasonable suspicion to believe that the violator being pursued is a felon or suspected felon." EXHIBIT 3 at §

- 16 -

Definitions.  "Felony" is defined in the policy as "[a]n offense for which a sentence to a term of at least one (1) year or more of imprisonment may be imposed."  EXHIBIT 3 at § Definitions.  The policy states, in bold language: "Pursuits for misdemeanor violations are prohibited."  EXHIBIT 3 at § Definitions.  The policy does not define "misdemeanor," which is generally known to be an offense for which a sentence of imprisonment of no more than one year may be imposed.

71.     The violations that began at least four of the seven known pursuits, speeding and reckless driving, are not even misdemeanors. Speeding, KRS 189.390, and reckless driving, KRS 189.290, are traffic violations for which no sentence of imprisonment may be imposed.  Reckless driving is punishable by a fine of not more than one hundred dollars, KRS 189.990(1); the maximum fine for speeding is two hundred dollars, *see* KRS 189.394.

72.     Sam Carter's written pursuit policy has never been enforced.

73.     Sam Carter has never provided any training to deputies or otherwise taken any steps to ensure that deputies understand and follow the written pursuit policy.

74.     By failing to train his deputies about the written pursuit policy, failing to enforce the written pursuit policy in the face of repeated and multiple violations, and otherwise failing to ensure that ACSO deputies understand and follow the written pursuit policy, Sam Carter implicitly told and signaled to his deputies that the written pursuit policy is not important.

75.     By failing to enforce the written pursuit policy, Sam Carter approved and ratified his deputies' improper pursuit conduct, thereby creating customs and practices that became the actual pursuit policy of the Allen County Sheriff's Office.

76.     Sam Carter testified under oath that every pursuit conducted during his tenure as Allen County Sheriff for which he has records was a "successful" pursuit, even those pursuits where innocent bystanders were seriously injured, even those pursuits where children were

- 17 -

placed at great risk, and even those pursuits where his deputies were seriously injured and police vehicles were damaged.  Sam Carter even testified under oath that he considers the pursuit of Brian Germany for speeding, which resulted in Brian's death, to have been "successful."

77.     While the written policy of the Allen County Sheriff's Office governing the conduct of employees during pursuits is set forth in EXHIBIT 1, the actual policy, custom or practice is that any action is acceptable to apprehend suspects, regardless of the alleged violation of law, regardless of the risks to lives and property, and regardless of any and all other circumstances or conditions that may be present.

78.     Sam Carter's "anything goes" policy is even more dangerous than having no pursuit policy at all, because under the actual policy Sam Carter does not even demand that his deputies follow Kentucky law, which requires pursuing officers to operate their vehicles with due regard for the safety of all persons, KY. REV. STAT. § 189.940.

79.     The actual policy, custom or practice of the Allen County Sheriff's Office under Sam Carter is that the apprehension of traffic violators is far more important than the lives and safety of the people in the community.

### 42 U.S.C. § 1983

80.     The Plaintiff adopts, reiterates and incorporates by reference each and every allegation contained in  the preceding and subsequent paragraphs as if set forth fully herein.

81.     Danny Davis was acting under color of state law in engaging in the conduct described herein, and the conduct of Danny Davis deprived Brian Germany of rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution without due process of law.

- 18 -

82.     Sam Carter was acting under color of state law in engaging in the conduct described herein, and the conduct of Sam Carter deprived Brian Germany of rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution without due process of law.

83.     A Fourth Amendment seizure occurred when Danny Davis intentionally and by use of physical force terminated Brian's freedom of movement, a right which all citizens are guaranteed by the United States Constitution.

84.     Danny Davis violated Brian's Fourth Amendment rights by using excessive force in the course of the seizure.

85.     Danny Davis's actions were not objectively reasonable under the circumstances.

86.     Danny Davis's actions, and especially his actions once the pursuit entered the field, posed a high likelihood of serious injury or death to Brian, posed a substantial and immediate risk of serious personal injury to Brian, and posed an actual and imminent threat to Brian's life.

87.     Brian's actions, and especially his actions once the pursuit entered the field, posed no actual or imminent threat to the lives of, and posed no substantial and immediate risk of serious personal injury to, any third party motorist or pedestrian or to the officers involved in the pursuit.

88.     There were numerous safer ways to apprehend Brian, given the time, place and circumstances. Notably, Danny Davis knew that the pursuit would have necessarily ended at the bottom of the field, which was only a few hundred yards away.  Danny Davis also knew that SPD Officer Tabor was behind him to provide backup.

89.     The likelihood that Brian would be seriously injured or killed by being struck with Danny Davis's vehicle in the field was equal to or greater than the likelihood that Brian would be seriously injured or killed if Danny Davis had instead decided to shoot Brian with his gun.

90.     The likelihood that Danny Davis, sitting in his 4,000 pound police vehicle, would be seriously injured or killed in the field was minimal. The likelihood that Darren Tabor, following a safe distance behind in his vehicle, would be seriously injured or killed in the field was virtually nil.  The likelihood than any other person would be seriously injured or killed in the field was zero, as no other person was present.

91.     The likelihood that Brian could have escaped from the muddy field on his street bike was virtually nil.

92.     A Fourteenth Amendment substantive due process violation occurred when Brian was deprived of his life by the actions and inactions of Danny Davis and Sam Carter without due process, a right which all citizens are guaranteed by the United States Constitution.

93.     The unconstitutional customs or policies of the Allen County Sheriff's Office, including but not limited to the actual policy, custom or practice that any action during pursuits is acceptable to apprehend suspects, regardless of the alleged violation of law, regardless of the risks to the lives and property of the community or the suspect, and regardless of any other circumstances, and the actual policy, custom or practice that the apprehension of traffic and misdemeanor violators is more important than the lives and safety of the people in the community, and the "anything goes" pursuit mentality fostered and endorsed by Sam Carter were the cause, in whole or in part, of Brian's death.

- 20 -

94.     The  Allen County Sheriff's Office's written pursuit policy is facially lawful, but its actual pursuit policies, customs and practices were taken with deliberate indifference to their known or obvious consequences.

95.     The risks of a constitutional violation arising as a result of the inadequacies in the actual pursuit policies, customs and practices of the Allen County Sheriff's Office, and as a result of its failure to train and monitor deputies, and as a result of its failure to enforce the written pursuit policy are plainly obvious.

96.     There is a direct connection between the constitutional violations described herein and Brian's death.

97.     The conduct of Danny Davis and Sam Carter and the conscious policies of the Allen County Sheriff's Office were indifferent to the high probability of risks to the community, the pursuing officers and pursuit suspects.

98.     By his actions and inactions, Sam Carter authorized and permitted his deputies to use any amount of force they desire to apprehend fleeing suspects, even deadly force, totally without regard to any of the circumstances.

99.     Danny Davis was aware of the dangers Brian faced during the pursuit, especially once the pursuit entered the field, Danny Davis's actions played a part in the creation of those dangers, and Danny Davis's actions rendered Brian more vulnerable to those dangers.

100.    Sam Carter was aware of the dangers all suspects, including Brian, face during pursuits, Sam Carter's actions and inactions in creating the actual policies and customs of the ACSO played a part in the creation of those dangers, and Sam Carter's actions and inactions rendered Brian more vulnerable to those dangers.

101.    Sam Carter's knowledge of the risks created by the actual policies and customs of the Allen County Sheriff's Office represents wanton disregard of the risks to the community, pursuing officers and pursuit suspects and amounts to far more than mere thoughtlessness.

102.    Sam Carter consciously and voluntarily failed to respond to those known risks.

103.    Sam Carter was aware of prior unconstitutional actions of his employees engaging in pursuits and failed to respond to those actions.

104.    Danny Davis's actions, including but not limited to entering the field at high speed and close proximity to Brian's motorcycle, and ramming Brian's motorcycle, were intentional, were arbitrary actions intentionally designed to punish Brian Germany for fleeing, were deliberately indifferent to such a degree that they represent callous disregard for the risk of injury, were an arbitrary exercise of power that shocks the conscience or indicates an intent to injure, and/or were so egregious that they can fairly be said to be arbitrary in the constitutional sense.

105.    Sam Carter's actions and inactions, including but not limited to failing to enforce the written pursuit policy, following the actual pursuit policy, customs and practices, failing to train his deputies, including Danny Davis, about the written pursuit policy and the safe operation of vehicles during pursuits, failing to monitor his deputies, including Danny Davis, during pursuits, and keeping Danny Davis as a deputy when he knew or should have known he was unqualified, were intentional, were arbitrary actions intentionally designed to punish fleeing suspects, were deliberately indifferent to such a degree that they represent callous disregard for the risk of injury, were an arbitrary exercise of power that shocks the conscience or indicates an intent to injure, and/or were so egregious that they can fairly be said to be arbitrary in the constitutional sense.

106.    The constitutional violations set forth herein were a substantial factor in causing injury to Brian Germany, his minor son and his estate.

## NEGLIGENCE AND GROSS NEGLIGENCE

107.    The Plaintiff adopts, reiterates and incorporates by reference each and every allegation contained in the preceding and subsequent paragraphs as if set forth fully herein.

108.    Danny Davis was negligent or grossly negligent in failing to follow the Allen County Sheriff's Office written pursuit policy.

109.    Danny Davis was negligent or grossly negligent in failing to drive his vehicle with due regard for the safety of all persons upon the highway, including the safety of Brian Germany, in violation of KY. REV. STAT. § 189.940.

110.    Danny Davis was negligent *per se* in failing to drive his police vehicle with due regard for the safety of all persons on the highway, in violation of KY. REV. STAT. § 189.940.

111.    Danny Davis was negligent *per se* in failing to maintain a reasonably safe distance between his vehicle and Brian's motorcycle, in violation of KY. REV. STAT. § 189.340(8)(a).

112.    Danny Davis was negligent *per se* in failing to keep his vehicle under control during the pursuit, in violation of KY. REV. STAT. § 189.290.

113.    Danny Davis was negligent under the doctrine of *res ipsa loquitor*.

114.    Danny Davis unjustifiably used deadly physical force on Brian Germany in violation of KY. REV. STAT. § 503.090.

115.    Danny Davis did not reasonably believe that deadly force was necessary to apprehend Brian, and did not reasonably believe that Brian was likely to endanger another human life unless apprehended without delay.

116.    Sam Carter was negligent or grossly negligent in failing to enforce the Allen County Sheriff's Office's written pursuit policy and Kentucky laws regarding police pursuits and the safe operation of police vehicles and otherwise to ensure that Danny Davis followed such policies and laws.

117.    Sam Carter was negligent or grossly negligent in failing to train deputies, including Danny Davis, on the written pursuit policy and Kentucky laws regarding police pursuits and the safe operation of police vehicles or otherwise to ensure that Danny Davis followed such policies and laws.

118.    Sam Carter was negligent or grossly negligent in failing to adequately train, supervise and monitor his deputies, including Danny Davis.

119.    Sam Carter was negligent or grossly negligent in keeping Danny Davis in his employ as a deputy sheriff when he knew or should have known that Danny Davis did not have suitable skills or was otherwise incompetent to perform the duties of a deputy sheriff.

120.    The negligent or grossly negligent acts and omissions set forth herein were a substantial factor in causing injury to Brian Germany, his minor son and his estate.

### DAMAGES

121.    The Plaintiff adopts, reiterates and incorporates by reference each and every allegation contained in  the preceding paragraphs as if set forth fully herein.

122.    As a direct and proximate result of the conduct of Sam Carter and Danny Davis as set forth herein, Brian Germany suffered bodily injuries and endured physical and mental pain and suffering before his death in an amount to be determined by the jury, incurred funeral and burial expenses in the amount of $14,253, his earning capacity over the course of his lifetime was destroyed in the amount of $1,208,463, and he and his estate have been damaged thereby.

- 24 -

123.     As a direct and proximate result of the conduct of Sam Carter and Danny Davis as set forth herein, T.A.G. has been deprived of the services, assistance, aid, society, companionship, love and affection of his father, Brian Germany, the value of which will be determined by the jury.

124.     The conduct of Danny Davis as set forth herein was grossly negligent or reckless, exhibited a wanton disregard for the lives and safety of others, and/or showed actual malice, and as a result of his gross negligence, recklessness, wanton indifference or actual malice he should be held liable for punitive damages in an amount to be determined by the jury.

125.     The conduct of Sam Carter as set forth herein was grossly negligent or reckless, exhibited a wanton disregard for the lives and safety of others, and/or showed actual malice, and as a result of his gross negligence, recklessness, wanton indifference or actual malice he should be held liable for punitive damages in an amount to be determined by the jury.

**WHEREFORE**, the Plaintiffs, Denise Walker, as Administratrix of the Estate of Brian Germany, Deceased, and Denise Walker, as Next Friend of T.A.G., a Minor, demand judgment against the Defendants for compensatory and punitive damages; trial by jury on all issues so triable; their costs herein expended, including reasonable attorney fees; and any and all other relief to which the Plaintiffs may appear entitled.

**s/ Ross T Turner**

Ross T Turner
6500 Glenridge Park Place, Suite 12
Louisville, Kentucky 40222
phone: 502.429.9303
fax: 502.429.9304

*Counsel for Plaintiffs*